**Kelly v. Westinghouse Electric Corp.**

C.P. of Allegheny County, no. GD 91-20287.

*John M. Leonard,* for plaintiff.
*Louise Symons,* for defendant.

FRIEDMAN, *J.,* June 20, 1996—

## INTRODUCTION

The captioned case was heard by the court sitting without a jury. At the close of the evidence, counsel for defendant requested and was granted the opportunity to file suggested findings of fact and conclusions of law. Plaintiff's attorney presented brief oral argument and was also granted the right to reply to defendant's written suggestions. The court has therefore chosen to present its rationale for its decision in the form of findings of fact and conclusions of law. It should be noted that, although the underlying claim has been decided, in favor of plaintiff, the amount of counsel fees and costs has not yet been determined, so no verdict can yet be entered. An order regarding the determination of the counsel fee award has been entered so that a verdict in the full amount can be entered.

## FINDINGS OF FACT

(1) Defendant is plaintiff's employer.

(2) Defendant is the pension plan administrator.

(3) The pension plan is not a defendant in this case.

(4) Plaintiff was a vested beneficiary of the pension plan when she resigned.

(5) Plaintiff reasonably believed that she would receive monthly pension payments of $161.10 beginning on May 1, 2006, and continuing for her lifetime.

(6) Plaintiff never requested a lump sum payout of her pension plan benefit.

(7) Defendant paid plaintiff's pension plan benefit in a lump sum of $5,768.67 to a third person (plaintiff's former husband) who filed the application supplied by

defendant under a forged signature which appeared to have been acknowledged by a notary but which signature did not appear to have been *witnessed* by the said notary, as required by defendant's procedures.

(8) There is no evidence that defendant had any procedures either to prevent applications from being sent to incorrect addresses or to prevent wrongful applications from being fully processed with checks being mailed to fraudulent applicants, other than "verifying" addresses according to the compliance of various post offices across the country with whatever "return to sender" policies they might have had and the checking of applications for notarial seals and checking the dates of signatures.

(9) Plaintiff never notified defendant of her changes of address.

(10) The only indication to defendant's employees, including plaintiff, that defendant should be informed of address changes was one sentence, in ordinary type, contained in a lengthy paragraph in a many-paged employee handbook, and given no particular emphasis by defendant at any time prior to this lawsuit.

(11) No request or suggestion or requirement regarding notification to defendant of address changes was contained in the letter from defendant to plaintiff, dated July 28, 1978, describing plaintiff's pension benefits and sent to plaintiff a few months after plaintiff voluntarily left defendant's employment.

(12) In the normal course, plaintiff would not have discovered the fraud, and defendant's part in allowing it, until 2006, the year, plaintiff was told by defendant, that her monthly pension checks would begin.

(13) Plaintiff discovered the fraudulent withdrawal of her pension fund monies solely by chance, and contacted defendant immediately thereafter.

(14) Upon learning of the forgery of plaintiff's signature, defendant did not take any steps, such as reinstating her pension account, to correct its erroneous payout of plaintiff's pension benefits to a third person under a forged signature.

(15) Defendant instead chose to incur attorneys' fees in an unknown amount to defend itself on the grounds that its woefully inadequate procedures were all that ERISA requires of it.

(16) Defendant admits that the forged application for plaintiff's pension benefits should not have been processed under the policies and procedures it then had in effect.

(17) The check for the lump sum was not even sent to the *purported* current address of plaintiff but instead was sent to an address which defendant at that point should have regarded as outdated under its policies and procedures then in effect.

(18) Defendant relied solely on the post office's mail return policies for "verifying" the addresses of former employees.

(19) On its face, the forged application shows that the notary did not "witness" the signing of the form by plaintiff herself.

(20) On its face, the forged application shows that the notary did not "witness" the signing of the form by plaintiff's former spouse.

(21) On its face, the forged application shows a purported current address different from the address in-

dicated as still "good" in defendant's records as they were "updated" or kept current by defendant based on the postal service's supposed non-return of annual statements directed to plaintiff.

(22) In 1989, defendant notified approximately 40,000 former employees of the availability of an early lump sum amount of their pension plan and sent applications in the *same* mailing even though defendant's *only* way of verifying the *correct* addresses had been to rely on various post offices behaving in a certain way without fail.

(23) Defendant had to process 27,000 applications for former employees who requested lump sum payouts.

(24) Defendant expected to receive some wrongful applications for lump sum payouts.

(25) Defendant hired eight temporary workers at a time to process the 27,000 applications received for lump sum pension payouts.

(26) Defendant had no *written* guidelines for the eight temporary workers to follow in processing the 27,000 applications.

(27) Defendant has no written record of what *oral* guidelines or instructions were to be given to the temporary workers assigned to processing the applications.

(28) Defendant did not follow even its inadequate procedures with regard to the instant plaintiff.

(29) There is no evidence that the instant case represents a unique or unusual mistake.

(30) The sum needed to make plaintiff whole is $12,149.11, which is the present value of future payments of $161.10 per month beginning in May 2006 and continuing through plaintiff's statistical life expec-

tancy. (Defendant presented *no* evidence which would contradict or even question plaintiff's evidence to this effect. Instead, it relied on its legal conclusion, with which this court disagrees, that payment of a judgment against defendant can come *only* from the pension fund and that the *amount* payable must therefore be based only on calculations to be made by the pension plan's terms, as though defendant had done nothing wrong.)

## CONCLUSIONS OF LAW

(1) Defendant did not comply with the ERISA provision that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . ." 29 U.S.C. §1104(a).

(2) Defendant did not have adequate controls over its payment of lump sum pension benefits and did not act "solely in the interest of" persons such as plaintiff who was admittedly a participant and beneficiary of the plan in question.

(3) Defendant did not set up policies and procedures which, if followed, would "discharge [its] duties" regarding the notification of the availability of a lump sum payout option to persons such as plaintiff "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."

(4) Defendant did not set up policies and procedures which, if followed, would "discharge [its] duties" regarding the payment of lump sums, "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."

(5) In addition, the evidence shows, at best, only feeble and perfunctory attempts to implement policies and procedures which would protect the pension benefits of former employees such as plaintiff during the lump sum payout notification and payout process.

(6) While this case only involved the claim of one person, the evidence and the strategy and tactics of defendant strongly suggest that no one yet knows the true failure rate of defendant's flawed lump sum payout process. Certainly, no evidence was adduced to show this debacle was either unique or rare. In addition, no evidence was adduced to show that defendant at the time had any plan or procedures to discover or deal with the inevitable mistakes its human and therefore fallible employees might be expected to make in handling the large number of lump sum payout applications. Defendant appears to have relied on luck.

(7) Defendant, not the pension plan, has the duty to make plaintiff whole because defendant did not comply with ERISA.

(8) Defendant has waived the right to restore plaintiff to the pension plan.

(9) Defendant must pay plaintiff the sum of $12,149.11 so as to restore her expected future income from the pension fund which defendant's inadequate policies and procedures, both before and after the fraud

which they negligently facilitated, have prevented plaintiff from receiving.

(10) Because the central purpose of ERISA is to guard against the loss of expected pension benefits by innocent employees such as plaintiff, reasonable counsel fees and costs must also be awarded so as not to reduce the net amount of her expected pension benefit to plaintiff. ERISA provides for the award of counsel fees and costs in section 1132(g).

(11) Plaintiff is therefore awarded reasonable counsel fees and costs, in an amount to be determined after the filing of an affidavit by plaintiff's counsel regarding a detailed itemization of expenses, costs and number of hours spent by each attorney or paralegal who worked on this case, with the hourly rates charged for each such attorney or paralegal. Defendant may file a counter-affidavit, if desired, regarding the customary hourly rates for attorneys and paralegals in the Pittsburgh area for cases such as this and regarding the necessity (or lack thereof) of spending time or money as plaintiff's attorney may have claimed. If the affidavit of plaintiff's attorney and any counter-affidavit of defendant, raise a substantial dispute as to the reasonable amount of the counsel fee award, an evidentiary hearing will be scheduled on the amount to be awarded. If there is no substantial dispute, the court will enter an order based on the affidavits, entering a verdict which will include the award of counsel fees and costs.

## ORDER

And now, to-wit, June 20, 1996, the court having concluded that a verdict should be entered, for the plaintiff, in the captioned matter, which was heard by the

court sitting without a jury, it is hereby ordered that plaintiff's counsel submit his affidavit regarding counsel fees, as described in the attached memorandum in support of order, no later than July 8, 1996. Defendant's counsel may submit a counter-affidavit, as described in said memorandum, no later than July 22, 1996. The court will then determine whether and when to schedule any evidentary hearing or additional argument regarding the amount of counsel fees and costs to be awarded, or, if there is no substantial dispute as to such amount, the court will enter a verdict without further hearing or argument.